v. Federal Government not to exceed 15 minutes. And if these are your final comments, Brian and Henry from the department may proceed. Good morning. Good morning, Your Honors. If I could please reserve three minutes of my time for rebuttal. The district court has given law enforcement officers an open invitation to shoot and kill as soon as they see any movement from a suspect who's not complying with their orders. Officer Zola's decision to use deadly force in this matter was not objectively reasonable. Officer Zola did not take the time to properly assess the situation that was in front of him. This court has previously held in Sample v. Bailey, their theory is he's lying in wait in this closet, that they announced at the top of the stairs, if you're there, come on out. And they come, they search the whole basement, and they're outside the closet, and if you're in there, come on out. He doesn't come on out, that he's lying in wait, and they open the door, and all of a sudden there's a sudden movement, and it's a split-second decision by the officer for his own safety. And you're saying we're going to give a license for the officers to kill. Well, if we rule the other way, the other argument is that we are going to put officers at risk because they cannot protect themselves when they reasonably believe that they are going to be shot at, and they are going to be deadly force against them. I mean, the lying in wait here, I think, distinguishes it from those other cases where he's unnoticed and he's hiding, and he doesn't comply. I mean, can you come up with a case that's somewhat similar to this? I think that Sample versus Bailey is that individual was lying, hiding in wait inside a warehouse. He was on the second floor of the warehouse. It was dark. It was night. He was in some type of storage container where he was hiding. He was not responding to the officer's commands to come out. One of the officers happened to open up the container and saw that he was in there. So that case is similar to this. Did he do a sudden movement like this? He did do a sudden movement. I mean, the one difference between that case and this case is Sample lived. He was there to say that he was reaching out to try to grab onto the railing to pull himself out. The officer, Bailey, said he observed the suspect Sample reaching. The geography in those two cases is a little different. If you're inside a container, I mean, at any point he could have, theoretically, kicked open that closet door and shot. You've got to come up out of a container. You've got to get, was there a lid on it? I mean, it's just a different situation. He could have, I mean, in theory, the suspect in Bailey could have fired as soon as he saw the officer pull the container open. He could have shot. And in Bailey, the Sixth Circuit said some movement is expected. And in this particular case... The arrest warrant is for armed robbery, right? It is. And I think he's got other convictions of violence. And so they think that he may be armed and dangerous in sudden movement by somebody who may be armed and dangerous. I mean, aren't we really putting the officers in peril if they can't react to that? These officers, and I think it depends on the situation, in this particular case with Danny Withers, these officers were in tactical positions. They had searched and cleared the entire house. If there was one place that Withers was going to be at, at that point in time, it was in the closet with a gun. Potentially. He didn't have a gun, did he? He did not have a gun. I mean, in Sample v. Bailey... They didn't know whether he had a gun. It turned out he didn't. They didn't. They might have thought he may have had a gun, but was there some statements made, or more than once, or once, show us your hands, or hands up, or come out and show us your hands, appear and show us... I don't know exactly what the words were, but something about show us your hands? It depends. All three of the officers testified they were in a position that they were yelling out commands as they were going through the house. When he gets to the basement area, there's some dispute between the officers. The officers aren't consistent as to what was being said, whether they stopped yelling to show us your hands once he started walking down the stairs, whether there were any orders at that point in time to Withers. And other officers claimed that they continued to yell out for him to come out or to show his hands or to say something. What they saw, or what Zola saw when he looked, was kind of an angle looking into the closet where when the door was open and he had his flashlight, he saw the person, and he could see a hand go up. But he couldn't see the other side of the person's...maybe it was the right hand that went up and couldn't see the left side of the body or something? There's a dispute about that? No, I think that's what Zola has testified during his deposition. He saw a silhouette of a man, and he saw the right hand begin to go up, but he made the decision to shoot in less than a split second. We talk about split second judgments in these cases. He said it was less than a split second. It doesn't qualify that immunity isn't intended to protect officers' split second decisions when they're reasonable under the circumstances. And we shouldn't judge, second judge, split second decisions like that because this is an excessive force claim. You're claiming that he intentionally violated your client's constitutional rights by using excessive force. And usually split second decisions there don't come into play because there's usually some conscious decision that I'm going to use more force than necessary and that reasonable officers would not, under this situation, but a split second thing, as long as it's reasonable under the circumstances, is usually allowed. But was it a split second decision? Well, you just told me it was. His testimony, and what we said in our brief, his own deposition testimony, he made the decision to shoot in less than a split second. Those were his words. Less? Okay. Less than a split second. So is he more protected there? No, I think that that leads to the inference, if he saw any movement in that closet, he was firing. Whether it was one step out, whether it was any movement of the arms, he was firing as soon as he saw movement in that closet. When you make the decision to fire your weapon into that closet as soon as you see any movement in less than a split second, and without seeing whether he had anything in his hands, that is not constitutionally permissible. You had, these officers were in tactical positions. It wasn't like they just happened to be walking by this closet door and the door opened. They were in tactical defensive positions. Detective Shoulders, Sergeant Shoulders, who opened the door, testified during his deposition that he told Zola that he was going to open the door in case somebody came jumping out of that closet or something happened. These officers had flashlights trained on that door. They had their guns pointed at that door. Shoulders was the closest one to Withers in the closet. He was right there. He opened the door. And even though he saw Withers' arm begin to move, he didn't fire his weapon. He didn't think it was necessary at that point. He was expecting some type of movement is what his actions would suggest. Zola. Did they all see the person in the closet more or less at the same time? I think the only one who had an obstructed view was Officer Shapiro. You got Zola and Shoulders? Shoulders was standing by the door or kneeling down by the door to open it. Zola is 8 to 9 feet away with his gun trained on the door. Shapiro is off to the side but has his flashlight shined at the door with his gun down at his side. And the fact that Shapiro has his gun down at his side is something that this honorable court should take into consideration too. Just as one of the officers in Bailey had his gun holstered as he was opening the container where the individual was hiding, Shapiro is here with only his flashlight pointed at the door. Any time an officer is searching a house, an individual could reach and grab a gun. Or what happens at a traffic stop? Any movement, any time an officer pulls over somebody, an individual could reach for and grab a gun. But the question is how long should the officer have to wait before he has to fire his weapon? And less than a split second is not constitutionally permissible. What do you do with the problem of the qualified immunity here? The problem of clearly established law. Don't you have to meet that test? We do have to meet that test, Your Honor. And the law is that... The law emanates from what, Tennessee v. Garner on excessive force? Yes. In Bailey, this court reasoned that there's no factual distinction between a case like Bailey and any other one, any other one in which police officers confront a suspect to an effect and arrest. An individual, once you have your gun and your flashlight trained on an individual, even if that individual isn't hiding before, once you have your gun and your flashlight trained on him, it's the same as any other type of arrest when you're trying to arrest a suspect. And you need to be able to take the time to look to see whether or not that individual has a gun in his hand. Let's look at this Floyd v. Detroit that I cited in my brief. In that situation, officers are responding to a complaint that an individual was threatened by another individual with a gun. They go there, they see the individual that meets the description, and as they're approaching him, they hear a gunshot, and one of the officers falls to the ground. The other officer fires. The hurdle you have to go over is the clearly established law hurdle, correct? Correct. I mean, it's not just... That's the basic hurdle that you've got to go over. And now it seems to me the Tennessee v. Garner case is relevant in the sense that that was at night. The person had burglarized. It wasn't a robbery, but the person had burglarized a house, had just burglarized a house and was trying to run away. And the officer, as I remember, had a flashlight, turned it on the person, and the person was trying to escape, go up a fence, and the officer leveled on him and killed him. And the Supreme Court said that was excessive force. Now, if your case is the same as that or more or less the same, then it would satisfy Tennessee v. Garner, would satisfy clearly established. If it's not similar, then it would not. Are you following me? I mean, you've got a Supreme Court opinion about it. And I don't know whether the Supreme Court thinks that what we do is clearly established. They think what they do is clearly established. So that seems to me to be the test. I'd agree with you on that, Your Honor. And I think that the same logic applies in that case, applies to this case. Withers was confined to the area of a closet. I mean, he wasn't like a suspect that could run a far distance and scale a fence. I mean, in this case, he's confined to a closet. They have him surrounded. They have three officers, guns pointed, flashlights out. The perimeter of the house is secure. They searched every inch of that house. This case is easier than Tennessee v. Garner because he's there. He can't escape. There's less area for him to escape or operate. They have Zola testified that he had to. On the other hand, I guess they're closer to him, so Zola clearly was perhaps frightened. Anyway, he did the shooting. So is the physical aspects of the case different in theory from Tennessee v. Garner? I don't think in theory that they're different. I mean, even if the officers in this case were closer, the perimeter was secure. They had searched every inch of that house. There was an expectation that Withers was going to be in that closet. There was an expectation there was going to be some movement once you open that closet door. And the fact that you wait less than a split second before making the decision to use deadly force is not constitutionally permissible. That's your conclusion. Any other questions? You've got your three minutes, Mr. Murray, for rebuttal. Good morning. Good morning. My name is John Baceweis, Jr. with the City of Cleveland Law Department, and I'm here on behalf of the defendant and police officers. With me is Sean Malamud, also with the City of Cleveland Law Department. He's here on behalf of the City of Cleveland on the Monell claim. Have you divided your time? Yes. Mr. Malamud has two minutes. To the panel, this case is really very simple, actually, as opposed to the case that we heard right before, which was quite complicated. And the bottom line is the district court got this absolutely correct. Let me walk you back through this. We have three officers who are going to serve an arrest warrant. They're going to serve it at a home on a person who had just threatened to blow the head off of a bank teller and also has a prior weapons conviction, which they are aware of. So this is not just approaching someone on the street. They actually have prior knowledge that they are going to apprehend. That's somewhat similar to Tennessee v. Garner, the guy had just robbed, just burglarized a house next door and was leaving the house. The police didn't know for sure who he had shot, where he was armed, but he had just committed a serious crime. So far, we're similar, Your Honor, but then things become very different from Tennessee v. Garner. When the officers arrive, they first call out and try to identify where is Danny Withers. Grandmother opens the door, in fact, admits that, yes, there's a Danny Withers who lives there, and they go in. Now they have to search for this person. This is a house where Danny Withers lives. He has the advantage. Who knows where there may or may not be weapons, but the officers have to arrest this person. They know he's in the house because they've seen him in a window upstairs, is that right? They believe that that's Danny Withers. I don't think that any of the officers could have said with certainty, but I know I think at least Shoulders testified that he believed it was Danny Withers who called down to them. I'm not sure if they saw him. There was a voice that answered because there's some testimony that initially it asked for Kevin, and a voice came from upstairs and said, nobody named Kevin lives here, and then that person just disappeared. So now they're going through the house to search for Danny Withers. They start on the top floor. It's a three-floor home. As they're searching for him, they're calling out for him. They're giving him every opportunity to surrender, and it could have been something as simple as just letting him know, here's where I am, so you do not have to feel afraid. He could have said, I'm here. I'm in this room. I'm unarmed. He could have done a number of things to make these officers feel a little bit safer. He does the opposite. He's silent and he's hiding. This, if I'm an officer. Presumably from the third floor to the basement. Right. I mean, I have no idea how he got from where he was. Yeah, I mean, certainly it wasn't magic. So, yes, he must have got there probably by feet. So as this is going on, the tension is heightening for these officers. They have time. They do call in backup to surround the home because they realize there are other points of ingress or egress, and this guy's dangerous. If he gets away, who knows what he's going to do. So they continue their search, giving him every opportunity to give himself up, and he doesn't do it. Eventually they get down to the basement, and this has taken a while. And all this time, this guy isn't complying. So they're looking through the basement. It's dark. And, yes, they do take tactical positions when they finally get to the last place. The reason they take tactical positions. What do you say about hands? I believe that the testimony had to do with come out. I don't know if anyone ever said, show us your hands. I'd have to go look back at the briefing. Well, that's what I gather from the briefing. But I don't believe that anyone said that in the moment just prior to the firing. I believe if it was said, it was said sometime a few minutes or even further back before that. I thought it was coming down the steps. They knew now he's in the basement. It may have been coming down the steps, but even if it were coming down the steps, I believe they searched the basement for two to three, maybe even four minutes before they finally get to this closet. Now, they do take tactical positions. The reason that they do that is because this is such a dangerous situation. And this closet, and here's a big distinction from Sample v. Bailey. In Sample, it was a tiny compartment where the person was balled up. He couldn't quickly move, do anything furtive, anything of that nature. This was a large closet where there's just as much room as I have right here. You can be doing stuff with your hands. You can leap. You can do all kinds of stuff. And they set up in their tactical positions. Shoulder's job is to open the door. Okay? Zola's job is to cover. He is in this firing cone, as it's called, where instantly someone produces a gun, you're dead. How far away is he, 10, 12, 15 feet? I think it was roughly 10 feet, give or take. It was a close proximity. From where the door opens. Right. And Shapiro is behind him, and Shapiro testified, I believe, that the only reason he didn't fire is because he could have hit Zola. Very strategic positions, I guess. Well, there's only so much space in a basement, Your Honor. I mean, this isn't a perfect world. They had to do the best that they could. Well, that's the question. Did they do well enough, I guess? So now the door opens. And for all these opportunities to surrender, to do whatever he could have done, one hand comes right up, and he can't see what's in the hand. He sees the arm. He can't see the other side of the guy. He doesn't know whether the guy is raising his hands and surrendering or what, because he can't see the other side of the silhouette, right? And then the question becomes reasonableness. Is this true? I would have to look back at the record. I believe that there's simply no testimony whatsoever that the left hand ever comes up. So we have one hand coming up. He couldn't see it. I mean, he wouldn't think it came up if he didn't see it. But I understood the angle of looking at the interior of the closet where he had the flashlight on the guy would not show, or perhaps would not show, an open question of whether it would show, the other hand coming up so that he was trying to surrender. Your Honor, I think that that question that you're asking right now really obfuscates the issue. I think at this point in time, considering— It may obfuscate it for you, but I just would like to know what the facts are. That's the reason I'm asking. Your Honor, there's no evidence that they saw the left hand go up one way or the other. At this point in time, given all that they knew, the question then is, is the use of force reasonable? And it was a split-second decision. It was a reaction. And the reality is, if Danny Withers had had a gun in his hand, it's very possible that Danny Zola is dead today, or Shapiro is dead today. Just because they were in tactical positions and there were three of them and there was a flashlight on them didn't mean they were safe. How was he going to see them if they had a flashlight? You know how it is in the dark when somebody puts a flashlight in your face. All you see is the light. You don't see beside him or what's behind it. Is that the situation we have here? Your Honor, I'm not sure what you're—I mean, you're asking me, did he have a flashlight? At least my experience is, if you're in the dark and someone shines a flashlight in your face, you only can see the light. You don't see the parameters of what's behind. How would the guy hit the officer if he had the flashlight right in his face, in his eyes? Well, first of all, Your Honor, just to briefly address that, number one, you're actually looking at the wrong standard with all due respect. The standard is— I'm doing a lot of things wrong here. Just try to answer my questions. There's no way for me to know, Your Honor. And what matters is the point of view of the officer. I don't know. Probably from that distance, I think if you were 10 feet away and someone had a flashlight at me about the distance I am from, Your Honor, that I would be able to see other things. The light wouldn't be so close to my eyes that was blinding me. I could see other things that were going on. Moreover, I'd be aware that I had just committed a crime, so there's reason for police to be looking for me. And we're also—Danny's well aware that these are police in the house who are in fact looking for him. And anyone with common sense knows that when police come to arrest someone, they're going to do it armed. And moreover, if you're hiding from them, which is what he was doing, if you're perhaps lying in wait, it's just giving them more reason to be fearful that you're going to do something terrible, that you're going to try to kill one of them. And with that screwdriver in his hand right there, which is what he dropped, my guess is he's probably going after shoulders, but we don't know that. We're never going to know. And the way the case has to be looked at is a reasonable officer at the time, given what they knew under the circumstances. And I think this case is very simple. Do we know he had the screwdriver in his hand? I know the screwdriver was found at the scene, but, I mean, is it just an inference that it was in his hand? Your Honor, I'd have to go back and look at the depositions. The way I have it in my mind, as you sort of put these cases together, I believe that there's evidence that the screwdriver was in his hand. I will say that ultimately. The officer didn't see it, though. Danny Zola, who fired? No, he actually, in fact, never saw the hand. He saw the arm flash up. And he didn't say, I saw the arm flash up with a screwdriver. No, he didn't say I saw the arm flash up with a screwdriver, no, Your Honor. At this point, I do have time remaining. I think I've made all the points I need to make so I can address any questions that the panel has. Well, one question. Sure. The Seventh Amendment. Your Honor. Trial by jury in civil cases where it's a matter of law here, not equity. The Seventh Amendment requires trial by jury if there's factual disputes. Right. Your Honor, I believe the Seventh Amendment requires trial by jury if there are factual disputes that could lead a reasonable trier of fact to find for the nonmoving party. And there are not facts here that could lead a reasonable jury to find for the plaintiff. It's not just any fact in the world. If we're disputing what color shirt he wore, that doesn't matter. And when you look at the actions here, the undisputed testimony, no reasonable juror could find for the nonmoving party in the summary judgment in this case, which is the plaintiff or penalty. Any further? No. All right. Mr. Malamud has a minute or two to address Monal and the panel has any questions. Good morning. May it please the Court. My name is Sean Malamud. I actually may have less than a couple of minutes. As the Court's aware, a claim under Monal was also brought in this case. The district court correctly determined that because there was no underlying constitutional violation by the officer. After that occurred, as I understand it, there was an agreement between the Cleveland Police Department or the Cleveland Government and the Department of Justice. And I've got a copy of it here. And it seems from just reading it currently that the Cleveland Police Department concedes that it did not have good training for the officers with regard to the use of force, and particularly deadly force. Are you aware of that agreement? I'm aware of the fact that the Department of Justice and the city are presently in litigation. I am aware that there is a consent agreement, Your Honor. A consent agreement, yes. I was not involved in any respect. Have you read any of the consent agreement? Yes, Judge. There are provisions in there about this deadly force and excessive force problem that apparently the Cleveland Police Department thought they had. Certainly the Department of Justice did, and they entered into, as you say, an agreement about it. And there is language in which the Cleveland Police Department seems to be conceding that its training for this was not up to snuff. Your Honor, I know that the Department of Justice came in and did an investigation. I know that— Did they investigate this case or all cases? Your Honor, I don't know the breadth of what they asked the city to produce. Okay. In other words, I believe it was for a five-year period. Again, I'm in a section of the Cleveland Law Department that defends these cases. I wasn't involved in the actual meeting with them. How many police shooting cases have you defended? Many, Judge, since 1986. A lot of experience. Yes. But just as my understanding of the status of the matter with the DOJ, there was a consent agreement. The case is not resolved. The city and the DOJ are still involved before Senior Judge Oliver in Cleveland about the case. What are they still litigating about? Because it looks like at least some of it has been resolved. That very well may be, Judge. I can tell you, Your Honor, that I am familiar with the written use-of-force policy, and I can represent to the Court that, if it's in the record here, that that written use-of-force policy of the city absolutely comports with the Constitution. We get it, that you must use as much force as is reasonably necessary under the circumstances. Deadly force must be used only when it absolutely is required. So the written policy is there. My understanding of the training with the cases that I've had is that the training comports with the written policy. I guess you would agree then that Tennessee v. Garner is really the case on excessive force where the Supreme Court back in 1985 laid out the parameters of the law about that. Yes, Judge. That's the seminal case that begins an evolution of this area of law. But as to this case, I know the Court's aware of the . . . The Court found that no officer violated the Constitution, therefore there's no reason to then take a look at whether or not there's any Monell liability. But I appreciate the Court's interest in the DOJ matter and that, again, this is an unresolved, ongoing matter that is not settled. It's still in litigation before Judge Oliver. Thank you, Counsel. Thanks, Judge. All right, now you have three minutes rebuttal. Thank you, Your Honor. Mr. Murray, you told me about a case involving a container in a warehouse in which the suspect was hiding. Yes. Is that Bailey? Yes, Your Honor. Well, I didn't recognize it because I think of that case as being Sample rather than Bailey. Sorry, Sample versus Bailey. I thought that Sample or Bailey, whoever was the suspect, was in a cupboard. He was in a cupboard and he was smooshed in there so that it took him some effort to get out and that when they opened the door to this space, they could see his hands and could see that he had nothing in his hands. Am I wrong about that? It depends on whose version of the facts you agree on. I don't recall it being a cupboard. I thought it was some type of a closed container that was on the second floor. The big difference between Bailey in this case is that the suspect in Bailey survived, so he had his facts and his testimony to say that he was trying to reach out to pull himself out. Since he said he had to pull himself, he was reaching for a railing to pull himself out. I didn't believe that it was a closet that he was in. They could see his hands, though, and that was the same case in Floyd, was it not? I mean, the holding there is you're supposed to look at somebody's hands if you've got a chance to do it. The officers in those cases, both Bailey and in Floyd, well, in Bailey, the officers at least, even if you took the defendant officer's version of the facts, he at least waited to see the suspect reach into his pocket before he fired his weapon at the suspect. Now, the suspect in Bailey said he was reaching to pull himself out and never reached into his jacket. So there's a difference in the facts that were before the court on Bailey as to whether the individual was reaching into his jacket to possibly pull out a weapon or whether he was sticking his arm out to pull. Well, the point was, though, unless I'm wrong, the officer could see both his hands. It wasn't that split-second sort of... Right. The officers didn't wait less than a split second before firing. They waited to see if they could see the hands. And in Floyd, the officers admitted, the officer that shot admitted that he never looked at Floyd's hands. Floyd was the one that said he had his hands up and that his hands were visible. The suspect said he had his hands up and his hands were visible. The officer claimed that he never took the time to look at the hands before he fired. As soon as he sears the gunshot and sees his partner fall. The point I'm trying to make is the holding in those cases was that if you can see the suspect's hands, you lose the fight, that you should look at the hands and see if there's a gun in the hands. I think it's more than just that. In Floyd, the court reasoned, had Renesa, Officer Renesa, looked at Floyd's hands even momentarily before shooting him in the chest, he would have presumably seen that Floyd was unarmed. It's taking the time. It's waiting more than less than a split second. Officer Zola testified... I think we're familiar with those facts. Thank you, Ken. Thank you. Thank you, Mr. Byrd. Case will be submitted.